# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 97-3728

_____

Michael Robert O'Rourke; Jeff     *
Rosenzweig, as Next Friend of     *
Michael Robert O'Rourke,     *
    *
         Appellees,     *   Appeal from the United States
    *   District Court for the
      v.     *   Eastern District of Arkansas.
    *
Roger Endell, Director, Arkansas     *
Department of Correction,     *
    *
         Appellant.     *

_____

Submitted: April 13, 1998
Filed: July 28, 1998

_____

Before McMILLIAN, BOWMAN,[1] and MURPHY, Circuit Judges.

_____

BOWMAN, Circuit Judge.

---

[1]The Honorable Pasco M. Bowman became Chief Judge of the United States Court of Appeals for the Eighth Circuit on April 18, 1998.

Roger Endell, Director of the Arkansas Department of Correction (the State),[2] appeals from the judgment of the District Court granting a writ of habeas corpus under 28 U.S.C. § 2254 to Michael Robert O'Rourke, who is in state custody pursuant to a conviction of capital murder under Arkansas state law and who is under a sentence of death. We reverse.

## I.

We begin with the facts of the crime for which O'Rourke was convicted and sentenced to death, the murder of his parents on July 28, 1983.

The bulk of the most damning testimony against O'Rourke during trial was elicited from Dennis Meadors, O'Rourke's roommate, lover, and accomplice in the murders. Meadors and O'Rourke met in March 1983, several months before the murders, and it was not long after they met that O'Rourke moved into the mobile home in Russellville, Arkansas, that Meadors was sharing with another individual. Meadors testified that O'Rourke told him early in the summer of 1983 that he wanted to kill his parents in order to inherit money, or to receive money as the beneficiary of his parents' life insurance policies. He also testified that O'Rourke had said he would pay for Meadors to go to truck driving school and would buy him a truck, and that they would

---

[2]At O'Rourke's 28 U.S.C.§ 2254 hearing in the District Court in January 1994, counsel for the Director of the Arkansas Department of Correction indicated that Larry Norris should be substituted for Endell. See Transcript of § 2254 Hearing at 81-82. Further, the District Court in its opinion noted that "Larry Norris is now Director of the Department." Rosenzweig v. Endell, Civil No. PB-C-91-134, Mem. Op. and Order at 1 n.1 (E.D. Ark. Aug. 30, 1997). Apparently, the substitution never was made, as the case comes to us with the caption shown. In fact, in the State's brief on appeal, counsel for the State refers to Endell by name as though he is indeed the proper party. We will assume counsel knows whom she represents, and we will not sua sponte change the caption on appeal.

buy land and build a house. Meadors said that, at least at the time of these discussions, he did not know how O'Rourke would acquire the money to reach these goals.

A few days before the murders, on July 22, 1983, O'Rourke and Meadors purchased a .22 caliber revolver from a pawn shop in Russellville. Meadors was shown as the purchaser of the gun, ostensibly because O'Rourke had a criminal record. Meadors purchased ammunition for the gun elsewhere. Meadors testified that they purchased the gun at O'Rourke's insistence because Meadors allegedly was being threatened by a male acquaintance of a woman with whom Meadors worked. The next day, July 23, Meadors reported the gun stolen from beneath the seat of his unlocked car and, for a reason he could not explain at trial, on July 26 he paid the police department for a copy of the offense report. That same day, the two men headed north in Meadors's car to Table Rock Lake, Missouri, and paid for three days of camping upon their arrival at a campground there. On July 27, they spent the day at Meadors's grandmother's house, which was in Missouri and apparently not far from the campground, doing some yard work for her, and then returned to their campsite.

According to Meadors, O'Rourke woke him at 2:30 a.m. on July 28 threatening him with the supposedly stolen .22 caliber handgun. The two drove from the campsite to the home of O'Rourke's parents in Dardanelle, Arkansas. When they arrived at about 6:30 or 7:00 a.m., they woke Beulah and Francis O'Rourke. Michael O'Rourke took Francis outside, and then shot him twice in the head. Meadors watched the shooting and then went inside the home. O'Rourke followed, telling Meadors to kill Beulah, who was in the kitchen. Meadors hit Beulah several times in the back of the head with a hammer, which he had been carrying but had concealed since their arrival. Meadors testified that Beulah O'Rourke was still alive when she fell to the floor, despite Meadors's bludgeoning, so O'Rourke wrapped her face in plastic wrap in order to suffocate her.

-3-

clean up the house, even going so far as to

compost material from the

after being s

in        atchback of the elder O'Rourkes' car.  They also loaded into the cars variou

pieces of evidence they believed to be incriminating, and

retrieved                                                                                      ,

owing in his car.  The car with the bodies in it was left in

king lot of an apartment complex.  En route back to Table Rock Lake, the men

d                                                                                      n

e gun and the hammer in a water supply lake in Oklahoma;

into a river in Arkansas

e                                                                                      d

somewhere in Missouri.  The two went by Meadors's

house that night, "[b]ecause [O'Rourke]

so        uld have an alibi," Trial Transcript at 517 (testimony of Meadors), and the

spen  one last night at the campsite.  The next day, July 29, O'Rourke and Meador

went                                                                                      e

n went to Meadors's grandmother's house

The bodies of Beulah and Fran

midnigh  that night.  O'Rourke was notified on July 30, and apparently traveled t

Oklahoma                                                                                      e

elle on August 3, to be certain they had left no incriminating

e arrested and charged with hindering apprehension or prosecution.

, essentially confessing to the

rders                                                                                      e

harm him or his family if he did

where he and O'Rourke had disposed o

including the gun and the hammer. By August 4, 1983, O'Rourke had been charged with capital murder.[3]

## II.

We move now to the relevant procedural history of the case.

Ernie Witt was appointed by the Yell County Circuit Court on August 19, 1983, to represent O'Rourke.[4] During the next three years, several times, O'Rourke was found alternately incompetent to stand trial, and fit to aid in his own defense and proceed to trial. Eventually, in December 1986, O'Rourke was brought to trial, even though he had not spoken to his counsel for at least a year before then and remained mute throughout the trial. In his statements to the jury, Witt essentially acknowledged O'Rourke's participation in the murders; his defense was that O'Rourke was not guilty by reason of mental disease or defect.

The trial, including voir dire, lasted three days. The jury retired to deliberate at 3:30 p.m. on December 3, 1986, and returned with a verdict of guilty of capital murder (the only count on which the jury was instructed) in fifty-three minutes. The sentencing phase of the bifurcated trial was held immediately after the verdict was returned, although neither the prosecution nor the defense offered any additional evidence. The jury returned at 6:13 p.m., after just one hour and eight minutes of deliberation, and recommended a sentence of death, which the court imposed on December 5, 1986. The

---

[3]Meadors never was charged with homicide for his part in the murders. He pleaded guilty in February 1985 to hindering apprehension or prosecution and was sentenced to ten years of probation.

[4]At some point in the proceedings, Witt also evidently was retained by O'Rourke, but for most of the time that he represented O'Rourke it appears he was serving as appointed counsel.

O'Rourke  hen filed a petition in the Arkansas Supreme Court, pursuant t
Arkansas   ule of Criminal Procedure 37, seeking permission to proceed in the stat
circuit court with his motion for postco
by         osenzweig.                                                                        e
Arkansas Supreme Court determined that two of
evidentiary hearing in the circuit court:  (1) that counsel was ineffect
the trial court that the jury be instructed on lesser
was   neffective for failing to object to evidence and prosecutorial argument tha
O'Rourke       invoked his right to be represented by counsel after his arrest.  __e
_____, 765 S.
and    nied relief.  Rosenzweig filed an appeal, but then O'Rourke sent a letter to th
Arkansa  Supreme Court, which the court construed as a pro se motion, seeking t
withdraw his appeal and to termina
app
to          new counsel for the hearing."  _____, 778 S.W.2d 938, 93
(Ark. 1989) (per curiam).  The court continued:  "Mr. Rosenzweig contends tha
peti       is insane and that any action on this motion should be deferred pendin
disposit    of the Rule 37 appeal, but counsel is not entitled to make the decision o
whethe  his client is competent."  __  The court said Rosenzweig would continue t
represent O'Rourke
to waive that appeal.  Rosenzweig then evi
asking to be appointed to advocate the position that O'Rourke was incompe
the appeal.  ___ Transcript of Rule 37 Competency Hearing at 2.  Rosenzweig

---

[5]At times in this case Rosenzweig
                         , we will refer to claims made by O'Rourke and those

told the circuit court at the competency hearing that the supreme court had denied that motion.

The circuit court appointed Robert E. "Doc" Irwin to represent O'Rourke at the hearing in October 1990, but ordered Irwin to take the position that O'Rourke was competent. O'Rourke would not communicate with Irwin, stating at the hearing that he wished to represent himself. O'Rourke also told the court that he did not want Rosenzweig to represent him. The state called as a witness Dr. Oliver Wendell Hall, a psychiatrist from the Arkansas State Hospital, who visited with O'Rourke twice prior to the hearing, along with a psychologist and a social worker, in order to prepare a written evaluation as to O'Rourke's competence. No psychological tests were administered to O'Rourke for this evaluation, in part because he refused to be tested again. In his written report and in his testimony, Hall expressed the belief that O'Rourke was competent to make the decision to waive his appeal. Cross-examination by Irwin did not challenge that opinion and in fact appeared designed to bolster it (but, of course, that was in keeping with the court's order to advocate that O'Rourke was competent). The court, adhering to the remand order from the Arkansas Supreme Court, did not permit Rosenzweig to present witnesses or to advocate that O'Rourke was incompetent to waive his right to appeal, although Rosenzweig was present in the courtroom. The circuit court found O'Rourke was competent to waive his right to appeal, and consequently the supreme court dismissed his Rule 37 appeal.

The case then moved to federal court, where Rosenzweig, acting as next friend of O'Rourke and also as counsel, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The District Court held a competency hearing in January 1992, and found O'Rourke incompetent. The court stated: "The Court must conclude that O'Rourke does not have the capacity to make a knowing, understanding and voluntary waiver of the review of his conviction and death sentence at the trial and appellate levels of the state courts and in this Court." Rosenzweig v. Lockhart, Civil No. PB-C-91-134, Order at 1-2 (E.D. Ark. Jan. 16, 1992). The court "administratively

terminated" the federal proceedings "without prejudice to the right of petitioner to move to reopen." Id. at 2. Rosenzweig sought to return to state court and exhaust O'Rourke's state remedies by moving the Arkansas Supreme Court to revisit its order dismissing O'Rourke's appeal of the denial of his Rule 37 petition.

The supreme court was not persuaded by Rosenzweig's motion to reinstate the Rule 37 appeal. The court stood by the state trial court's prior determination that O'Rourke was competent to waive his appeal at the time he did so, noting that there was no "just cause to reinstate the appeal now simply because another psychiatric examination conducted later caused the District Court to find that petitioner is not competent at this time." O'Rourke v. State, 825 S.W.2d 262, 263 (Ark. 1992) (per curiam). After that decision, the District Court permitted O'Rourke to reopen his petition in federal court. O'Rourke alleged twenty-three grounds for habeas relief. The District Court held an evidentiary hearing and granted the writ, finding that O'Rourke's trial counsel was ineffective in the circumstances alleged in four of his claims. The State appeals.

III.

The State argues that three of the four claims of ineffective assistance on which the District Court based its decision to grant the writ are procedurally defaulted, because they were considered and rejected by the state circuit court in the course of its denial of O'Rourke's Rule 37 petition and O'Rourke dismissed his appeal from that denial, thereby precluding the Arkansas Supreme Court from reviewing those claims. Accordingly, the state argues that the District Court should not have considered them. It is undisputed that O'Rourke effectively abandoned his Rule 37 claims when he withdrew his appeal from the state trial court's denial of those claims. See Williamson v. Jones, 936 F.2d 1000, 1006 (8th Cir. 1991) ("[T]he petitioner's failure to pursue his or her claim in a state post-conviction appeal results in a procedural bar to federal habeas corpus relief."), cert. denied, 502 U.S. 1043 (1992). Therefore, a federal court

cannot consider such claims in a § 2254 action unless O'Rourke "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750 (1991). O'Rourke does not claim a fundamental miscarriage of justice, that is, actual innocence, see Maynard v. Lockhart, 981 F.2d 981, 985 (8th Cir. 1992), and so we do not consider any such claim, see Zeitvogel v. Delo, 84 F.3d 276, 279 (8th Cir.), cert. denied, 117 S. Ct. 368 (1996). Instead, he argues that he can demonstrate the necessary cause for his default, and prejudice from the alleged constitutional violations.

## A.

To overcome the procedural default, O'Rourke first must demonstrate that there was cause for his failure to raise his claims in the state postconviction proceeding. In order to do so, O'Rourke must "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." Murray v. Carrier, 477 U.S. 478, 488 (1986). O'Rourke argues "that the state court's external impediments on the development of the competency issue, including the forced relief of [Rosenzweig] and direction to new counsel to not contest competency, met the requirements of cause." Brief of Appellee at 26.

There is no dispute that a petitioner like O'Rourke can waive his right to appeal a state trial court's denial of postconviction relief, and thereby bar federal court consideration of the claims that were not pursued. Where mental competency is in issue, however, a finding must be made as to whether the petitioner had, at the time of the waiver, "capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises." Rees v. Peyton, 384 U.S. 312, 314 (1966) (per curiam). The state circuit court found O'Rourke had the necessary capacity, and the Arkansas

-9-

Supreme Court agreed.  The State argues that this finding is entitled to a presumption of correctness.

Under § 2254, a factual determination made by the state court, after a hearing, that is "evidenced by a . . . reliable and adequate written indicia" generally is entitled to a presumption of correctness by the federal habeas court.  28 U.S.C. § 2254(d).  "[A] state court's conclusion regarding a defendant's competency is entitled to such a presumption."  Demosthenes v. Baal, 495 U.S. 731, 735 (1990) (per curiam).  The presumption does not attach to the finding, however, if "the material facts were not adequately developed at the State court hearing," or if "the applicant did not receive a full, fair, and adequate hearing in the State court proceeding," or if "the applicant was otherwise denied due process of law in the State court proceeding."  28 U.S.C. § 2254(d)(3), (6), (7).  O'Rourke argues that the competency hearing was flawed and therefore the finding that he had the capacity to waive his postconviction appeal is not entitled to a presumption of correctness.  We agree.

Despite having had the opportunity to do so, the Supreme Court has yet to hold that a competency hearing must be adversarial in nature in order to be full and fair and to afford a prisoner the process he is due.  See, e.g., Hamilton v. Texas, 497 U.S. 1016 (1990) (misc. order).  Nevertheless, a prisoner may be entitled to have a "next friend" argue that he is incompetent to make a decision to waive a right to appeal, unless "an evidentiary hearing shows that the defendant has given a knowing, intelligent, and voluntary waiver of his right to proceed, and his access to court is otherwise unimpeded."  Whitmore v. Arkansas, 495 U.S. 149, 165 (1990).  We conclude that, without such a waiver and without the appointment of a "next friend" to advocate the position that the prisoner is incompetent, a competency hearing such as the one at issue here is not full and fair, nor does it comport with due process.

The two questions--the competency to waive a right and whether the waiver was knowing and voluntary--are distinct, although we have noticed in reviewing the record

-10-

in this case and researching the applicable law that the distinction is not always made clear.

> The focus of a competency inquiry is the defendant's mental capacity; the question is whether he has the *ability* to understand the proceedings. The purpose of the "knowing and voluntary" inquiry, by contrast, is to determine whether the defendant actually *does* understand the significance and consequences of a particular decision and whether the decision is uncoerced.

Godinez v. Moran, 509 U.S. 389, 401 n.12 (1993) (citation omitted).

We have studied the transcript of the competency hearing, which is the only occasion of record on which the state circuit court questioned O'Rourke about his waiver, and we conclude that it fails to "demonstrate that [O'Rourke] appreciated the consequences of [his] decision" to waive his Rule 37 appeal. Whitmore, 495 U.S. at 165. Just as no one at the hearing took the position that O'Rourke was incompetent, so no one advocated that his waiver was less than knowing and voluntary. Nor do O'Rourke's comments made at the hearing show that he understood "the significance and consequences" of his decision to waive his appeal.

After the psychiatrist from the Arkansas State Hospital testified to his opinion that O'Rourke "does have the capacity to appreciate the -- the situation, the legal proceedings, and to give some opinion of whether he wants to abandon those," and that O'Rourke suffered no "mental disease or defect" (but before the doctor was "cross-examined" by O'Rourke's counsel appointed for the hearing), O'Rourke spoke for the first time during the hearing. Transcript of Rule 37 Competency Hearing at 21. His exchange with the court demonstrated only his obsession with representing himself at the hearing. At one point, O'Rourke did say he wished to be executed, but that comment was made in the context of the ongoing discussion about O'Rourke's legal representation by Irwin.

BY THE COURT:  Well, do you understand that this is highly technical and that--

MR. O'ROURKE:  I understand, sir.

BY THE COURT:  --you are under a penalty of death--

MR. O'ROURKE:  I understand, sir.

BY THE COURT:  --and that if you do not have a lawyer, perhaps your probability of actually having the death penalty carried out would be the more?

MR. O'ROURKE:  That is what I wish, your Honor.

BY THE COURT:  Specifically you wish what?

MR. O'ROURKE:  To be executed.

Id. at 24-25.[6]  O'Rourke's statement that he wished to be executed falls far short of demonstrating that he fully understood the consequences if he voluntarily short-circuited his state postconviction challenges to his conviction and sentence.  The court never explained to O'Rourke the significance of his decision to waive his postconviction appeal.  No one questioned him as to his understanding of the possible results of a successful appeal, which might have included not only a lesser sentence but a new trial with a potentially different outcome.  At the end of the hearing, after the court found O'Rourke "competent to waive any further appeal," the state did ask the

---

[6]The court's apparent concern that O'Rourke have good legal representation, ostensibly to improve O'Rourke's chances of avoiding the death penalty, is curious, in view of the fact that the court had instructed appointed counsel to take the position that O'Rourke was competent to waive his appeal, a position that if sustained would mean he would move more directly--and certainly--to his execution.  Thus, by accepting his appointed counsel, O'Rourke would hasten his demise, not delay or prevent it.

court to inquire as to O'Rourke's wish to waive his appeal, but O'Rourke refused to answer.

> MR. GILLEAN [for the state]: Your Honor, there might be one thing that might be helpful, if the Court would make some sort of determination about whether or not it is Mr. O'Rourke's desire at this time and presently to abandon his further appeals. I guess that's obvious from the circumstances here, but it might be helpful to have a record of that. I'm wondering if the Court could just ask him if that is still his intention or still his desire?
>
> BY THE COURT: Is it your desire, Mr. O'Rourke, to abandon an appeal of your case?
>
> MR. O'ROURKE: I've already made my position clear in the Court, sir. I have no comment to make when I'm not allowed to represent myself.
>
> BY THE COURT: That concludes the matter.

Id. at 44-45.

Even allowing for the state circuit court's ability to observe O'Rourke's demeanor and his apparent capacity to argue cogently about his right to represent himself, this record falls short of demonstrating that O'Rourke was able to "understand his position or make a rational decision concerning" his waiver. Anderson v. White, 32 F.3d 320, 321-22 (8th Cir. 1994). Instead, the record as a whole demonstrates that it cannot be said with any satisfactory degree of confidence that O'Rourke's waiver of his Rule 37 appeal was knowing and voluntary. Similarly, we think the record discloses no basis for a reliable finding that O'Rourke was mentally competent to waive his right to the Rule 37 appeal.

-13-

We believe O'Rourke should have been represented by an attorney, either a counsel of record or a "next friend," to argue that he lacked the capacity to waive his appeal. See Whitmore, 495 U.S. at 165. The court's failure to appoint such a representative resulted in an evidentiary hearing on O'Rourke's competence that failed to develop adequately all material facts, that was neither full nor fair, and that did not afford O'Rourke the process he was due. Therefore, the state court's finding of competence is not entitled to a presumption of correctness. See 28 U.S.C. § 2254(d). We are unable to conclude, however, on the record before us that O'Rourke has established "by convincing evidence that the factual determination by the State court was *erroneous*." 28 U.S.C. § 2254(d) (emphasis added). Because no one advocated the position that O'Rourke was incompetent, the record is inadequate for us to say that the finding of competency was erroneous and that O'Rourke was incompetent at the time of the waiver--just as we cannot conclude from the record that the finding was correct and that he was competent at the time. We can and do say that O'Rourke did not receive an adequate hearing on the question of his competence, and that the finding that he was competent to waive his right to appeal is inherently unreliable. That finding, which was a consequence of the unfair evidentiary hearing, which itself resulted from the state court's interference in the proceedings, constitutes an "objective factor external to the defense." If not merely unreliable but in fact erroneous, it could be said to have prevented O'Rourke from exhausting his state postconviction remedies, that is, it could establish "cause."

But in the absence of a conclusion that the finding of competency actually is erroneous, is the mere chance that the finding would have been different had O'Rourke received an adequate hearing on the question of his competency to waive his Rule 37 appeal a sufficient showing of cause to excuse O'Rourke's procedural default? Is the absence of an adequate competency hearing ipso facto cause? We find no clear guidance in the existing case law. We are cognizant of the possibility, far from remote, that after an adequate hearing the state circuit court could have made a reliable finding that O'Rourke was competent and that his waiver was knowing and voluntary. The fact

is that at this late date it never can be known how an adequate hearing would have turned out.[7]  Because of our holding that O'Rourke has failed to show prejudice to excuse his procedural default, see infra Part III.B., resolution of the issue of cause is unnecessary to our decision.  See United States v. Flynn, 87 F.3d 996, 999 (8th Cir. 1996) ("A court need not determine whether cause has been established if the defendant has failed to demonstrate actual prejudice.")  We therefore decline to decide the issue. We think the issue is a close and difficult one, and one best left for a case in which its resolution is required.

## B.

We turn now to the question of whether or not O'Rourke can show the necessary prejudice from the constitutional violations he alleges to satisfy the second part of the test for overcoming the procedural bar.  He alleges that he was prejudiced by the

---

[7]We have serious questions regarding the District Court's retrospective finding that O'Rourke was incompetent to waive his right to his Rule 37 appeal, made more than a year after the waiver had occurred.  As we have noted, the state court's more timely competency hearing was not full and fair (and thus it's conclusion was unreliable), and produced a record that was insufficiently developed to resolve the question of O'Rourke's competency one way or the other *at the time of the waiver*.  See Reynolds v. Norris, 86 F.3d 796, 802 (8th Cir. 1996) ("A 'meaningful' determination [of competence retrospectively] is possible where the state of the record, together with such additional evidence as may be relevant and available, permits an accurate assessment of the defendant's condition at the time of the original state proceedings."); cf. Weisberg v. Minnesota, 29 F.3d 1271, 1278 (8th Cir. 1994) ("Retrospective determinations of whether a defendant is competent to stand trial or to plead guilty are strongly disfavored."), cert. denied, 513 U.S. 1126 (1995).  It is clear from the record that O'Rourke's mental problems were more pronounced at some times than at others, so in this case a retrospective evaluation of competency becomes that much more unreliable.  Although it appears, on this record, that the District Court erred as a matter of law in concluding that O'Rourke was incompetent at the time of his waiver, the denouement of our discussion on cause makes its unnecessary for us to decide the question.

ineffectiveness of his trial counsel.  After careful study of the record, we conclude that he cannot demonstrate prejudice to excuse the default.

Before we consider the claims of ineffective assistance upon which the District Court based its decision to grant the writ, we review the cases that describe for us the sort of prejudice required to overcome the procedural default when the constitutional claim is ineffective assistance of counsel.[8]  The analysis of a Sixth Amendment claim that counsel was constitutionally ineffective includes its own prejudice test, which is an analysis undertaken when it first has been determined that "counsel's performance was deficient" (but may replace the deficiency inquiry altogether if the lack of prejudice is apparent).  Strickland v. Washington, 466 U.S. 668, 687 (1984).  Satisfaction of the prejudice test under Strickland "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  Id.  The question is whether the prejudice required to be shown to overcome a procedural default is the same prejudice required for a finding that counsel was constitutionally ineffective.

In the case of procedural default, we are looking for constitutional error that amounts to a denial of fundamental fairness at trial.  See Murray, 477 U.S. at 494.  "The habeas petitioner must show 'not merely that the errors at . . . trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'"  Id. (quoting United States v. Frady, 456 U.S. 152, 170 (1982)) (alteration in Murray).  Likewise, to

_____

[8]We will be citing cases that concern 28 U.S.C. § 2255 habeas petitions (challenging federal custody) as well as those dealing with petitioners seeking relief under § 2254.  It is clear that both this Court and the Supreme Court consider the one type of case applicable authority for the other, at least in the situation with which we are faced here.  See, for example, § 2254 cases McCleskey v. Zant, 499 U.S. 467, 494 (1991), and Jennings v. Purkett, 7 F.3d 779, 782 (8th Cir. 1993), both quoting prejudice language from United States v. Frady, 456 U.S. 152 (1982), a § 2255 case.

demonstrate                    Strickland "the defendant must show that [the allege errors] actu                                                          a defendant                                        more likely than not altered the           in the case." Id.                                      a reasonable probability that, but for counsel's unprofessional errors, the result of the oceeding would have been different. A reasonable probability is a probabilit sufficient to undermine confidence in the outcome." Id.

Some years ago, a panel of this Court noted that the prejudice needed to surmount procedural default is "not dissimilar to _____'s prejudice test for ineffective e of counsel," and that the "same core concern pervades the ultimat requirement for a habeas petitioner to succeed." Mercer _____, 864 F.2d 1429, 1434                                                          s "analytically distinct procedural                                        Strickland prejudice required t establish the underlying claim for                    [9] Zinzer v. Iowa 60 F.3d 1296, 1299 n.7 (8th Cir. 1995), __ed with approval in _____, 69 F.3d  51, 858 (8th Cir. 1995), cert. denied                                    e prejudice analysis is different under the two tes standard than the by counsel, it the arguably lesser Strickland   ejudice, and therefore his procedural default cannot be excused.

---

T    conclusion was dicta. The petitioner had argued that counsel's ineffectiveness was "cause" for the procedural default. The court found no _____ prejudice from counsel's allegedly deficient performance, and therefore no cause for the Thus the court did "not consider the 'prejudice' component of the 'cause and Zinzer v. Iowa, 60 F.3d 1296, 1299 (8th Cir. 1995).

O'Rourke's procedurally defaulted claims all are claims of ineffective assistance of trial counsel. Specifically, he argues, and the District Court found, that counsel was ineffective (1) for failing to ask that the jury be instructed on lesser included offenses, (2) for agreeing to the introduction into evidence of the transcript of a conversation in which O'Rourke allegedly invoked his right to counsel, and (3) for failing to object to testimony and prosecutorial argument that O'Rourke allegedly invoked his right to counsel. We consider each claim in turn, taking 2 and 3 together.

1.

We begin with O'Rourke's strongest argument: that counsel was ineffective for failing to request that the jury be instructed on lesser included offenses within capital murder. Counsel Witt testified that O'Rourke had told him--the last time O'Rourke had spoken to him, a year or two before the trial--that he did not wish to serve a lengthy prison term. That is, O'Rourke indicated that if he were not acquitted on the basis of his insanity defense, then he wished to be executed. Witt further believed that the lesser included offenses were not supported by the evidence. He thought that the chances were good for acquittal by reason of mental disease or defect, and he did not want to jeopardize that possibility by giving the jury the opportunity to convict O'Rourke of a lesser offense.

Although an instruction on lesser included offenses is not constitutionally required, it is considered a valuable "procedural safeguard." Beck v. Alabama, 447 U.S. 625, 637 (1980). "The absence of a lesser included offense instruction increases the risk that the jury will convict, not because it is persuaded that the defendant is guilty of capital murder, but simply to avoid setting the defendant free." Spaziano v. Florida, 468 U.S. 447, 455 (1984). O'Rourke contends that this is what happened at his trial, and that the evidence of his mental illness, while perhaps not resulting in acquittal, may well have resulted in a conviction of a lesser homicide. We disagree.

-18-

At the time of the murders, there were three lesser homicide offenses arguably
pital murder under Arkansas law:  manslaughter, second degree murder,
and f
statute then in effect.

> **41-1501  Capital murder. ---** (1) A person commits capital murder if:
>
> (a)  acting alone or with one or more other persons, he commits or attempts to commit . . . robbery . . . and in the course of and in furtherance of the felony, or in immediate flight therefrom, he or an accomplice causes the death of any person under circumstances manifesting extreme indifference to the value of human life; or
>
> . . .
>
> (c) with the premeditated and deliberated purpose of causing the death of any person, he causes the death of two (2) or more persons in the course of the same criminal episode; or
>
> . . .
>
> (g) he enters into an agreement whereby one person is to cause the death of another person in return for anything of value, and the person hired, pursuant to the agreement, causes the death of any person.

Ark. Stat. Ann. § 41-1501 (1977).  O'Rourke was charged under the three subsections noted, and the jury was instructed on those three charges:  felony murder, premeditated murder causing the death of two persons, and murder for hire.  The jury returned a general verdict of guilty of capital murder (counsel did not ask the court to narrow the charges before submitting the case to the jury), so we do not know which of the factual scenarios supporting which of the three charges the jury found beyond a reasonable doubt.  It might have been all three, or just one or two.  This does not affect our conclusion that O'Rourke suffered no prejudice, however (although we might have been able to arrive at that conclusion a bit more easily if we knew just which facts the jury unanimously found beyond a reasonable doubt).

Manslaughter is the least of the three possible lesser included offenses on which the jury might have been instructed. O'Rourke might have been found guilty of manslaughter only if the jury found "that he cause[d] the death under the influence of extreme emotional disturbance for which there is reasonable excuse." Ark. Stat. Ann. § 41-1504(1)(a) (1977).[10] In the sentencing phase of the trial, the jury found no mitigating circumstances: not that such circumstances "probably existed," not even that there was evidence that any such circumstances existed at some time other than the time of the murders--and certainly not that such circumstances were proved beyond a reasonable doubt. Trial Transcript at 103, 104, 105. And among their choices was the mitigating circumstance that "[t]he capital murder was committed while Michael O'Rourke was under extreme mental or emotional disturbance." Id. In these circumstances there was no prejudice to O'Rourke because counsel failed to ask that the jury be instructed on manslaughter. The jury did not find that there was even evidence of an emotional disturbance, much less that there was a "reasonable excuse" for the disturbance as the manslaughter statute required.

The lack of prejudice to O'Rourke from counsel's failure to request instructions on second and first degree murder is not so obvious as it is for manslaughter, but nevertheless we think it is apparent from the record.[11] It is true that, if the jury had

---

[10]The other three possible manslaughter charges (causing or assisting suicide, recklessly causing death, and negligent felony homicide) were not supported by the evidence at trial. See Ark. Stat. Ann. § 41-1504(1)(b), (c), (d) (1977).

[11]Under Arkansas law certain of the possible charges under the second and first degree murder statutes are not lesser included offenses within the capital murder charges brought against O'Rourke, and thus the failure to instruct on the lesser charges could not have prejudiced O'Rourke. For example, second degree murder for "knowingly" causing the death of another, Ark. Stat. Ann. § 41-1503(1)(b) (1977), is not a lesser included offense within capital felony murder, as it "requires proof of an element not required for proof of felony murder"--that is, the accused's mental state. Brown v. State, 929 S.W.2d 146, 148 (Ark. 1996). Also, first degree murder under Arkansas Statutes § 41-1502(1)(b) (1977) ("with the premeditated and deliberated

found "a lesser culpable mental state," it might have convicted O'Rourke of a lesser homicide offense. Couch v. State, 621 S.W.2d 694, 695 (Ark. 1981). For example, if there was credible evidence that, at the time of the murders, O'Rourke was unable to form the necessary intent or to deliberate the murders, then a lesser charge, he argues, would have been appropriate. But, as we have discussed, none of the jurors found any evidence of mental or emotional disturbance. And neither did they find that there was evidence that the "capital murder was committed while the capacity of Michael O'Rourke to appreciate the wrongfulness of his conduct or to [conform] his conduct to the requirements of law was impaired as a result of mental disease or defect, intoxication, or drug abuse." Trial Transcript at 103, 104, 105 (alteration to correct minor typographical error at 103). Moreover, there was overwhelming evidence of O'Rourke's intent, premeditation, and deliberation. O'Rourke discussed the murders with Meadors weeks before they killed O'Rourke's parents. O'Rourke made careful plans and performed the necessary preliminaries--getting the gun, having the gun appear stolen, acquiring the hammer. He arranged alibis and orchestrated the destruction and disposal of evidence of the crime. With this evidence, a reasonable jury was not about to find that O'Rourke had a diminished mental state that prevented his premeditated and deliberate perpetration of the murders of his parents.

There is one possible first degree murder charge, however, that presents us with a more difficult case. Among the possible first degree murder charges is first degree felony murder, which is substantially the same as the capital felony murder statute (as on the books in 1983), except that the first degree felony murder statute does not enumerate the felonies. See Ark. Stat. Ann. § 41-1502(1)(a) (1977). By the same

---

purpose of causing the death of another person, he causes the death of any person") cannot be a lesser included offense within the capital murder charge of causing the death of *two* persons. See Couch v. State, 621 S.W.2d 694, 695 (Ark. 1981). These examples demonstrate why a narrowing of the charges or a more specific verdict might have aided our analysis.

token, the first degree felony murder statute does not exclude from consideration the felonies listed in the capital felony murder statute. The overlap between the two statutes, while not "constitutionally suspect," nevertheless requires an instruction on first degree felony murder when capital felony murder is charged, "because the same evidence used to prove [capital felony murder] of necessity proves" first degree felony murder. Hill v. State, 798 S.W.2d 65, 69 (Ark. 1990) (interpreting the recodified homicide statutes, Ark. Code Ann. §§ 51-10-101(a)(1), -102(a)(1) (Michie Supp. 1989)). So, at least by 1990, Arkansas law on this issue was clear. But the question for us is not whether there was trial error because the court failed to instruct the jury on first degree felony murder, but whether O'Rourke suffered actual prejudice from his counsel's failure to request such a lesser included offense instruction.

It now obviously would be helpful to our analysis to know if the jury found O'Rourke guilty beyond a reasonable doubt of the capital charges of the murder of two persons or murder for hire. If that were the case, it would be readily apparent that there was no prejudice from counsel's failure to request the first degree felony murder instruction. But even as it is, we have no problem concluding that O'Rourke suffered no prejudice from the failure to request the instruction. There was powerful, unrefuted evidence of O'Rourke's guilt on all three capital murder charges, especially the charge based on the death of two persons. Considering the record, we cannot say that O'Rourke suffered actual prejudice from trial counsel's failure to request that the jury be instructed on lesser included offenses.

Moreover, the sentencing proceedings provide some of the best evidence that there was no prejudice to O'Rourke as a result of his trial counsel's allegedly deficient performance. If in fact the jurors felt compelled to convict O'Rourke of capital murder-- the only crime charged--out of fear that acquittal because of mental disease or defect would result in a brutal crime going unpunished, they might easily have ameliorated that result by sentencing O'Rourke to life in prison instead of death. They did not do so; in fact, they found no mitigating circumstances whatsoever, to balance

against the aggravating circumstance they found, and sentenced O'Rourke to death in just over an hour. Cf. Hopkins v. Reeves, 118 S. Ct. 1895, 1901 (1998) (noting the "distortion" of the trial and sentencing when lesser included offense instructions that are justified are not given if a "jury unwilling to acquit had no choice but to impose the death penalty"). Granted, conviction of a lesser included offense might have resulted in a sentence of fewer years than life in prison. But these jurors imposed death, so they obviously would not have considered a sentence for a term of years, *any* term of years. The jurors had a choice--life in prison instead of death--if they felt some mitigation of the charges was required by the evidence presented. But they expeditiously chose the death penalty, notwithstanding the availability of a third option. Cf. Sanders v. State, 805 S.W.2d 953, 958 (Ark. 1991) (noting error of not instructing jury on first degree felony murder where jury convicted defendant of capital felony murder, but recommended a sentence of life in prison, not the death penalty).

> [W]hen the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense--but leaves some doubt with respect to an element that would justify conviction of a capital offense--the failure to give the jury the "third option" of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction.

Beck, 447 U.S. at 637. Such was not the case here. We have thoroughly studied the record, and we conclude that there could be no reasonable doubt that all of the elements of the three charges of capital murder on which the jury was instructed were proved, and by overwhelming evidence as is apparent from the jury's speedy deliberations. The murders were carefully planned and carried out--premeditated and deliberated. Further, there was never a suggestion, then or now, that O'Rourke in fact had not perpetrated the murders as charged. His only defense was mental disease or defect, and the jury was unable to find even a mental or emotional disturbance.

-23-

We hold that trial counsel's failure to request instructions on lesser included offenses did not "deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687. Therefore, O'Rourke was not sufficiently prejudiced to overcome his procedural default.

2.

We turn now to the question of prejudice with respect to O'Rourke's claim that trial counsel was ineffective for failing to object to the introduction into evidence of the transcript of a conversation in which, O'Rourke contends, he invoked his right to counsel. (In fact, O'Rourke's counsel agreed to the introduction of the transcript as a joint exhibit.) Related to that claim is O'Rourke's ineffective assistance claim concerning counsel's failure to object to testimony about the conversation and to the prosecutor's reference in closing argument to comments O'Rourke made during the conversation.

The transcript in question is the written record of a taped conversation between O'Rourke and Sergeant F.V. Kimery of the Arkansas State Police Criminal Investigation Division. O'Rourke had called Kimery from jail on August 4, 1983. When Kimery returned the called, he tape recorded it. The portions of the conversation relevant to O'Rourke's claim follow:

KIMERY:     Did you want to talk with me?

O'ROURKE:    (Unaudible) Well, uh, I told this, what's his name, wait a minute

KIMERY:     The lawyer?

O'ROURKE:   Yeah, he's not my lawyer, uh, he wants $27,000 to even represent me and he wants me to sign over all kinds of legal documents which I'm not willing to do. So I told him, you know I'm trying to get a

hold of a public defender and ask him where I can get one. I just got off the phone with KARK [a television station] telling them I can't get an attorney and that I had spoken with you and you had told me I had a right to have a public attorney and that I was willing to answer your questions but there's you know as far as this MR. (INAUDIBLE) he seems to be more interested in money than in who he's representing.

KIMERY:     I understand, of course as I told you, you have the right if you cannot afford an attorney, one will be appointed for you by the court.

O'ROURKE:   Alright, if you can get an attorney present, I'll talk to you.

KIMERY:     OK, well what do you want to talk about MIKE.

O'ROURKE:   Well, who is my attorney that's gonna be appointed while we're talking.

KIMERY:     Well, the court will have to appoint you an attorney.

O'ROURKE:   So we have to wait till a court does this.

KIMERY:     Right.

* * *

KIMERY:     Oh, you can talk to me MIKE anytime you want to but what I'm saying is we've built a case and you've been charged and I'll be very honest with you, right now we've got an excellent case, I think as far as I'm concerned an air-tight case. So you know, if you want to confess, I'll come and talk to you but if you want to deny everything, you need to do that with your attorney. So he can better represent you.

O'ROURKE:   I just want an attorney who I know that I know what the law is. I don't know the law like you, you know that.

KIMERY:     That's why I'm telling you this, like I say, as far as I'm concerned we've built a case and we've got a good case, an air-tight case

as far as I'm concerned. I don't mind coming and talking with you but there's no use in me coming down there and you telling me anything but the truth.

O'ROURKE: I hadn't said anything but the truth since I started talking to you.

KIMERY: In that case, I don't have any reason to talk with you.

O'ROURKE: OK, when will I get this attorney that I'm suppose to have so I can get in front of a judge and get the this MR. (INAUDIBLE) says I have the right to have these documents that are mine and to file charges against the officer that threatened me and other things.

KIMERY: OK, well, of course up until this point I had not heard that you did not have representation.

O'ROURKE: I have said that ever since I have been here. I have no representation whatsoever.

KIMERY: You had an attorney there with you when I talked to you.

O'ROURKE: He was not my attorney. Ask him if he was hired by me. He does not do a thing for me until he has $27,000 in his pocket.

KIMERY: Well, we didn't know that, he told us that he was representing you and

O'ROURKE: He does not represent me, he has never represented me.

KIMERY: In that case, of course you told us he was your attorney.

O'ROURKE: I did not tell you he represented me. I told you he was an attorney who was giving me legal advice.

KIMERY: Well, that's the same thing MIKE.

-26-

O'ROURKE:   No, it is not sir.  There is a big difference.  You have a right to represent yourself pro-say [sic] with the advice of a counsel, that does not mean the counsel is representing you.

KIMERY:     OK, well, the only thing I can tell you MIKE, our procedure here, the next procedure is arraignment and determination of if you can afford an attorney or not;  If you can't afford one, the court will appoint you one.  If you can afford one, you'll have to hire you one.

O'ROURKE:   Yeah, OK.

KIMERY:     But, if you are saying you can't afford one.

O'ROURKE:   All I'm trying to find out is you told me I had the right to an attorney during questioning, I did not have an attorney during questioning who was representing me.  Now do I have that right to have that attorney now?

KIMERY:     Yes.

O'ROURKE:   Can I have that attorney now?

KIMERY:     Sure

O'ROURKE:   Will you provide him for me now and bring him over here so I can speak to him?

KIMERY:     We'll get you one soon as possible.

O'ROURKE:   When is that sir?

KIMERY:     As soon as your arraignment comes up.

O'ROURKE: You will not get me an attorney until I have an arraignment?

KIMERY:     I would, its [sic] not my job to. . . . .

O'ROURKE:   Even though I have been read charges.

KIMERY:     give you an attorney or not, its [sic] not my job, that's the job of the court.

O'ROURKE:   You told me I have the right to have one present, are you refusing to give me one?

KIMERY:     Present during questioning, I'm not questioning anybody.

O'ROURKE:   You were questioning me and I didn't have an attorney present.

KIMERY:     Oh, yes you did too.

O'ROURKE:   He did not represent me sir.

KIMERY:     Well you had one present, it didn't say the man has to represent you. It says he has to be present.

O'ROURKE:   You can ask him, he does not represent me.

Trial Transcript at 806-07, 810-12. Witt testified that he stipulated to the admission of the statement in order to "expose" the jury to O'Rourke. Transcript of § 2254 Hearing at 68. He said, "A jury to acquit someone in rural Arkansas is going to have to hear from the defendant or they are going to have to know him, or the prosecutor has to have a very poor case, and this was my way of the jury getting to know Michael." Id. at 68-69.

O'Rourke further argues that counsel Witt was constitutionally ineffective for failing to object to this testimony by Kimery:

Q     [by the prosecutor]  Mr. Kimery, I believe that you have had some other contact with Mr. O'Rourke.  Is that correct?  Other than the initial investigation?

A     Yes, sir, I talked to Michael O'Rourke on July 30th.  I interviewed him as a suspect, and I believe you have a copy of that, on August 4th, 1983.

Q     What did he tell you when you interviewed him as a suspect?

A     He stated that he did not want to make a statement at this time on the counsel of his attorney.  As I recall, he had an attorney present.

Q     And did you also receive a telephone call from him?

A     Yes, sir, I accepted a telephone call from the Pope County Sheriff's Office, or jail, in Russellville, and they advised me that Mr. O'Rourke wanted to talk with me on the telephone.  I called him back on the telephone and talked with him then.

* * *  [Witness refreshes his recollection with the transcript of the telephone conversation.]

Q     Mr. Kimery, in this conversation did you apprise Mr. O'Rourke that you really didn't want to talk with him without an attorney present?

A     Yes, sir.

Q     Did he seem to comprehend what you were telling him?

A     Absolutely.

Q     In your opinion, as a police officer and investigator and dealing with criminals and people accused and witnesses, did this man appear to you to talk rationally to you about what was happening?

A    During our conversation he asked a number of questions about his rights that led me to believe he understood his rights, that made me believe that he knew exactly what he was talking about.

Trial Transcript at 617-19.

Finally, O'Rourke claims ineffective assistance of trial counsel based on Witt's failure to object to this reference during the prosecutor's closing argument:

Then in addition to that we've got the telephone transcript of an individual that --- of course, he's in jail, but he absolutely knows what his rights are and what's happened. And that brings me back to Dr. Kaczenski, who spent two years with this individual in many, many sessions. He says he's a manipulator.

* * *

You think about the testimony and you should think about it and you weigh it, but you see if that thread doesn't run through here, all through this case, is manipulation. You've got the telephone log and the statement that Mr. O'Rourke called Mr. Kimery. Look at that quite closely and see if that's not a man who knows what he's doing and knows what his legal rights are and is trying, even at that stage, even to manipulate the State Police.

Id. at 723, 725. Witt had little explanation for his failure to object to the argument. He testified that he believed that he probably just did not hear it.

O'Rourke contends that, had Witt objected to the evidence, it would have been excluded, and presumably he believes that an objection to the argument would have been sustained. O'Rourke may well be correct. To the extent that the prosecutor's closing statement might have been understood by the jury as an argument that O'Rourke's purported invocation of his right to counsel was evidence that he was

-30-

manipulative rather than insane, the argument was better not made. See Wainwright v. Greenfield, 474 U.S. 284, 295 (1986). Nevertheless, we do not address the question of whether O'Rourke's constitutional rights were violated by this evidence and counsel's argument. Again, the only question for us is whether the failure to object--counsel's purported ineffectiveness--was prejudicial to O'Rourke. We hold that it was not.

Once again we return to the undeniable fact that the unrebutted evidence of O'Rourke's guilt was overwhelming. In fact, O'Rourke's counsel, then and now, never have so much as suggested that O'Rourke did not participate in the murder of his parents. Moreover, the evidence supporting O'Rourke's defense--that he was suffering from a mental disease or defect *at the time of the murders*--was insubstantial. As discussed supra Part II.B.1., not one member of the jury found *any* evidence of "extreme mental or emotional disturbance" or "mental disease or defect" that would mitigate the crime, Trial Transcript at 103, 104, 105, much less the insanity necessary to find O'Rourke not guilty of the crime charged. The question was not whether O'Rourke was insane at some later time. The only issue relevant to his defense was whether he was insane when he murdered his parents. His own expert psychologist acknowledged that O'Rourke had "shifting perceptions":

> That is, Michael is a very bright individual and at times when he's got, so to speak, his feet on the ground, he knows very clearly the difference between right and wrong. He knows the consequences of his act, he knows how to conform his behavior to the requirements of law.

Trial Transcript at 694. Further, when asked for his "opinion on whether or not Michael understood the consequences of his conduct at the time of the alleged commission" of the murders, the psychologist said:

> [H]e would wax and wane into the psychosis, at the time he was in the psychotic condition, was delusional, and seeing his parents as some kind of unnamed enemy, he was not capable of conforming his behavior to the

-31-

requirements of law nor really fully appreciating the difference in right and wrong, feeling that it was right to do what he was doing. But as he would come back then *he would regain his capacity to understand fully*.

Id. at 698 (emphasis added). In addition, when discussing a statement O'Rourke gave to a law enforcement officer on July 30, just two days after the murders but before O'Rourke was arrested, the psychologist and Witt had this exchange at trial:

Q    [by Witt] That was pretty detailed information and quite sound information, was it not?

A    Yes.

Q    And do you think that that man was psychotic at the time he gave that information?

A    At the time he gave it, no, I don't think he was.

Id. at 700. The psychologist did qualify that statement by suggesting that O'Rourke was, at the time of the statement, psychotic but perhaps less severely so, and that the psychosis may have been such that it did not interfere "with his ability to go on and behave in a pretty normal way day after day." Id. So, while the disputed evidence and argument could have influenced the jury to believe that O'Rourke may have been relatively "sane" at the time he talked with Kimery and acknowledged his Sixth Amendment rights, that does not lead inexorably to the conclusion that the jury therefore would not find that O'Rourke was insane when he committed the murders several days before--the only time period during which his sanity is relevant to his allegedly undermined defense.

In these circumstances, considering the testimony of O'Rourke's own expert that O'Rourke drifted in and out of psychosis, and at times was not legally insane (that is, he knew "how to conform his behavior to requirements of law," id. at 694), we

-32-

conclude that the verdict reached by this jury would not have been different had the offending evidence been suppressed and had an objection to the improper argument been sustained. That is, we cannot say that the result of O'Rourke's trial--his conviction on capital murder charges--was unreliable. See Strickland, 466 U.S. at 687. O'Rourke was not "deprive[d] . . . of a fair trial" because of Witt's alleged ineffectiveness. Id.

IV.

We come now to the fourth and final ground on which the District Court based its decision to grant the writ. Again, the contention is that Witt was ineffective, this time for his closing argument to the jury, during which he called O'Rourke a "monster," Trial Transcript at 730, 732, 740 (closing argument), 758, 759 (sentencing argument), and said, "The evidence in this case, I think, shows that we have an individual sitting here as capable as Jack the Ripper, the Mad Hatter, Lizzie Borden, as capable of killing someone as probably we have in this country, other than . . . our military." Id. at 734.

The State does not argue that this claim is procedurally defaulted, so we deal only with the District Court's application of the Strickland test for ineffective assistance of counsel, a mixed question of law and fact. See 466 U.S. at 698. We review de novo. See Reese v. Delo, 94 F.3d 1177, 1181 (8th Cir. 1996), cert. denied, 117 S. Ct. 2421 (1997). Because we conclude that O'Rourke was not prejudiced by the argument, we do not consider whether counsel's performance was deficient under Strickland. See 466 U.S. at 697 ("[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.").

We first put counsel's statement in context. Considered from that perspective, it is clear that Witt was attempting to equate O'Rourke with historical and literary figures who, in Witt's opinion, were insane. Indeed, Witt testified that this is the idea

he was trying to impart to the jury. Immediately following his remarks invoking the names of these figures, Witt said:

> But Michael, you are, in fact, suffering from a mental disease or defect. Even you don't believe it, but you are. You are insane. You have my sympathy and I hope that this jury will agree that you are, indeed, even at this time, insane. And that you did not appreciate the criminality of your conduct at the time you shot your daddy.

Trial Transcript at 734-35. Viewing the argument in its entirety, it is readily apparent that Witt was attempting to persuade the jury of O'Rourke's insanity by referring to him as a "monster" and by likening him to figures Witt thought the jury would recognize as obviously demented. While the historical figures Witt chose to mention to the jury (Borden and Jack the Ripper) may have been problematic because of their notoriety as murderers as well as mad persons, we cannot say that his argument prejudiced O'Rourke's insanity defense. It should be remembered that "not every error that conceivably could have influenced the outcome undermines the *reliability* of the result of the proceeding." Strickland, 466 U.S. at 693 (emphasis added). At the risk of being repetitive, we point again to the overwhelming evidence of O'Rourke's participation in the vicious murders, not of strangers, but of O'Rourke's own parents. While the jurors did not accept O'Rourke's insanity argument, their failure to do so was not the result of his attorney's argument. Instead, the jury's verdict was the result of the strength of the state's evidence of O'Rourke's premeditation and deliberation, and the corresponding weakness of the evidence that O'Rourke suffered from a mental disease or defect at the time of the murders. As we have said before in this opinion, no one ever has suggested that O'Rourke did not in fact participate in the murder of his parents; his defense throughout has been to admit the murders and claim insanity at the time he committed them. Because O'Rourke never has alleged factual innocence, the comparisons drawn by Witt could not have prejudiced O'Rourke's defense. In these circumstances, we cannot say that the alleged error by Witt undermined the reliability of the verdict.

V.

In summary, O'Rourke has not demonstrated the necessary prejudice to overcome his procedural default. Therefore, we reject the three defaulted claims of ineffective assistance of counsel upon which the District Court based its decision to grant the writ. Further, we find no Strickland prejudice in the non-defaulted claim of ineffective assistance of counsel, the fourth ground relied upon by the District Court to grant the writ. O'Rourke does not argue that the other grounds for habeas relief that he raised in the District Court, all of which that court considered and rejected, are also grounds for affirmance. See Thompson v. Missouri Bd. Of Probation and Parole, 39 F.3d 186, 189 n.2 (8th Cir. 1994), cert. denied, 514 U.S. 1113 (1995) ("An appellee [without cross-appealing] may urge any ground for affirmance supported by the record."). Therefore, we do not review those portions of the District Court's decision.

The judgment of the District Court is reversed and the case is remanded with instructions to enter an order denying the writ.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-35-