# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-2103

_____

Terrick Terrell Nooner,                        *
                                               *
                Appellant,                     *
                                               *   Appeal from the United States
        v.                                     *   District Court for the
                                               *   Eastern District of Arkansas.
Larry Norris, Director, Arkansas               *
Department of Correction,                      *
                                               *
                Appellee.                      *

_____

Submitted: January 12, 2004
Filed:  April 4, 2005

_____

Before WOLLMAN, LAY, and BYE, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Terrick Terrell Nooner appeals from the district court's dismissal of his petition for writ of habeas corpus under 28 U.S.C. § 2254. The district court found Nooner competent to withdraw his petition and, in the alternative, held that Nooner's substantive claims were without merit. Although we conclude that the district court erred in finding that Nooner's motion to dismiss his petition was knowing and voluntary, we affirm the rejection of the petition on the merits.[1]

_____

[1]We deny Nooner's *pro se* motions dated December 27, 2004.

# I.

Scot Stobaugh, a college student, was washing clothes at a Little Rock laundromat at approximately 1:30 a.m. on March 16, 1993. Nooner approached Stobaugh in an apparent robbery attempt and shot him seven times at close range. A jury convicted Nooner of capital murder. During the penalty phase of his trial, the jury heard testimony from several witnesses, including Stobaugh's mother, who described the impact of Scot's death on his family. The jury also heard mitigation testimony from Nooner's stepfather. The jury found two aggravating circumstances (that Nooner had previously committed another felony, an element of which was the use or threat of violence, and that the murder was committed for pecuniary gain) and no mitigating circumstances. Nooner was sentenced to death by lethal injection.

Nooner appealed to the Arkansas Supreme Court, which affirmed his conviction and death sentence. Nooner v. State, 907 S.W.2d 677 (Ark. 1995). Nooner then sought post-conviction relief in the state courts. The Arkansas Supreme Court affirmed the trial court's denial of post-conviction relief. Nooner v. State, 4 S.W.3d 497 (Ark. 1999). Nooner's attorney filed a subsequently amended petition for writ of habeas corpus with the district court. While the petition was pending, Nooner, acting *pro se*, requested that the district court dismiss his petition. After the district court rejected this request, we directed the district court to reexamine its decision and determine whether Nooner was competent to withdraw his petition. After hearing testimony from three mental-health experts who had examined Nooner, the district court determined that Nooner was competent to withdraw his petition and granted his request. The district court also addressed the merits of Nooner's petition and concluded that his stated claims were without merit.

Nooner, through counsel, now appeals from the district court's competency determination. Nooner also raises three collateral challenges to his sentence: (1) that the admission of victim impact evidence pursuant to Arkansas' victim impact statute

-2-

violated the ex post facto clause of the Federal Constitution; (2) that Arkansas' victim impact statute is constitutionally infirm; and (3) that Nooner's trial counsel rendered ineffective assistance by failing to investigate and present mitigating evidence at sentencing.

## II.

We first examine the district court's factual finding that Nooner was competent to withdraw his habeas petition, which we review for clear error. Taylor v. Bowersox, 329 F.3d 963, 968 (8th Cir. 2003). We evaluate Nooner's competency to withdraw his habeas petition as we would evaluate competency to waive appeal of a state post-conviction proceeding because both actions bar further federal court review. Our inquiry is two-fold. First, we examine whether the defendant has the rational ability to understand the proceedings. O'Rourke v. Endell, 153 F.3d 560, 567-68 (8th Cir. 1998) (quoting Godinez v. Moran, 509 U.S. 389, 401 n.12 (1993)).[2] Second, we consider whether the defendant's waiver was knowing and voluntary, i.e., whether the defendant actually understood the significance and consequences of his waiver and whether the waiver was uncoerced. Id.

---

[2]The United States Supreme Court first addressed competency to waive habeas corpus rights in Rees v. Peyton, 384 U.S. 312 (1966) (per curiam). The standard in Rees was clarified as a two-pronged inquiry in Godinez v. Moran, 509 U.S. 389 (1993); accordingly, we cite the Godinez standard as discussed in O'Rourke v. Endell, 153 F.3d 560, 567 (8th Cir. 1998).

A.

Dr. Richart L. DeMier of the United States Medical Center in Springfield, Missouri, evaluated Nooner and found him not competent.[3] Dr. DeMier based his conclusion on two subjective indicators: Nooner's disorganized speech (which presented only when Nooner discussed his legal situation) and Nooner's illogical belief that he would be exonerated by a "hidden or removed lawsuit" after he appeared before the clemency board. Dr. DeMier testified, however, that he did not hold his opinion with his usual degree of confidence because Nooner was malingering to some extent.

Dr. Charles Mallory and Dr. Oliver W. Hall III of the Arkansas State Hospital also evaluated Nooner, and both of these doctors found him competent.[4] Dr. Mallory confirmed Dr. DeMier's impression of Nooner's strange speech patterns, and, like Dr. DeMier, he observed that they occurred only when Nooner discussed his legal situation.[5] Dr. Mallory also noted that Nooner realized that his ideas were strange, an uncommon awareness in most delusional people. Both Dr. Mallory and Dr. Hall agreed that Nooner was malingering.

---

[3]Dr. DeMier testified that he conducted personal observations of Nooner, performed nine psychological tests on him, and reviewed numerous documents.

[4]Dr. Mallory testified that he conducted personal observations of Nooner, reviewed his prison records, and reviewed Dr. DeMier's report and deposition testimony. Dr. Hall testified that he performed a similar review.

[5]Dr. DeMier testified that Nooner "seemed either unable or unwilling to discuss [the competency issues] without spontaneously interjecting lots of ideas about his various delusional beliefs." Mot. Hrg. Tr. at 25. Dr. Mallory provided an example: "[Nooner] said, 'Dr. DeMier, he said I was delusional, seeing things that aren't true. I don't know if he found me competent. I got air bubbles in my body.'" Id. at 43. Dr. Mallory testified that this "rational start and irrational ending" was "highly unusual, if not improbable in a person with genuine delusional illness." Id. at 44.

-4-

From the reports of the doctors, their testimony at the competency hearing, and its own observations, the district court concluded that Nooner was competent, finding that he was able to "make a rational choice among his options" and understood "his legal positions and options available to him."

### B.

We find no clear error in the district court's determination that Nooner had the ability to understand his request to withdraw his petition. All three experts concluded that Nooner was feigning some aspects of mental illness. All three agreed that Nooner's odd speech patterns manifested only when he spoke of his legal situation. Their only disagreement concerned whether these speech patterns were evidence of a mental condition that prevented Nooner from being aware of his legal position and making rational choices among his legal options: Dr. DeMier found evidence of a delusional thought process; conversely, Dr. Mallory and Dr. Hall thought that Nooner's speech patterns were further evidence of his malingering. We conclude that the district court reasonably assessed the strengths and weaknesses of the conflicting expert testimony. See Smith v. Armontrout, 812 F.2d 1050, 1058 (8th Cir. 1987).

### C.

The question remains whether Nooner knowingly and voluntarily sought withdrawal of his petition. O'Rourke provides some indicia of when a waiver is not knowing and voluntary. 153 F.3d at 568. Specifically, we observed in O'Rourke that: (1) the petitioner's testimony failed to demonstrate that he fully understood the consequences of his waiver; (2) the court never explained to the petitioner the significance of his waiver; and (3) no one questioned the petitioner as to his understanding of the possible results of a successful appeal. Id. We noted that "the record as a whole demonstrates that it cannot be said with any satisfactory degree of confidence that O'Rourke's waiver of his Rule 37 appeal was knowing and voluntary." Id. at 569.

The circumstances that we identified in <u>O'Rourke</u> are present here. Moreover, in <u>O'Rourke</u>, the court specifically asked the defendant whether he desired to be executed and the defendant stated that he did. <u>Id.</u> at 568. <u>See</u> <u>also</u> <u>Smith v. Armontrout</u>, 812 F.2d 1050, 1053 (8th Cir. 1987) (Smith testified that he wanted to be executed because "he hated confinement and preferred death to life imprisonment"). Here, the district court made no such inquiry, and two doctors testified that Nooner did not want to be executed.[6] Nooner believed that withdrawing his habeas petition would trigger a series of events (the setting of an execution date and his appearance before a clemency board) that would result in a "hidden or removed lawsuit" that would exonerate him.[7] In other words, Nooner believed, however illogically, that withdrawing his petition would lead to freedom, not death. Under these circumstances, we conclude that the record does not support the district court's finding that Nooner's withdrawal was knowing and voluntary.

## III.

Although Nooner's habeas petition should not have been dismissed, we agree with the district court that the petition fails on the merits. All three issues raised in the petition were adjudicated in state court. Accordingly, we must deny the petition unless the state court disposition "resulted in a decision contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the

---

[6]Dr. DeMier testified that "What [Nooner] told me very clearly is that he never asked to be executed. He did not want to be executed." Mot. Hrg. Tr. at 19. Dr. Mallory testified similarly. <u>Id.</u> at 58 ("He's told Dr. Simon, 'I don't want to die.' And he's indicated that in other ways, too.").

[7]Dr. DeMier testified that Nooner was unable "to give a rational explanation for what he thought would happen" at the clemency hearing. Mot. Hrg. Tr. at 27. "It was almost as though he were employing what we sometimes call magical thinking. That's a trait you see in two and three year-olds. They think that because they want something to happen, it will happen. And he wasn't able to tell me in any detail or in any what that I can understand what would transpire there." <u>Id.</u>

-6-

Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings." 28 U.S.C. § 2254(d); see also Williams v. Taylor, 529 U.S. 362, 405-06 (2000). When a state court correctly identifies the controlling Supreme Court authority, we address the "unreasonable application" clause of section 2254(d). See Colvin v. Taylor, 324 F.3d 583, 587 (8th Cir. 2003). We observed in Colvin that "the Supreme Court has repeatedly stressed that an unreasonable application is different from an incorrect one." Id. We may not grant a writ of habeas corpus unless the relevant state court decision is both wrong and unreasonable. Id.

A.

Nooner first argues that the Arkansas victim impact evidence statute, as applied in his case, is an impermissible ex post facto law. U.S. Const. art. I, § 10. The Arkansas legislature enacted Ark. Code. Ann. § 5-4-602(4) in response to the United States Supreme Court's decision in Payne v. Tennessee, 501 U.S. 808 (1991), which allowed admission of victim impact evidence during the sentencing phase of a capital trial. The statute was enacted after Stobaugh's murder but prior to Nooner's trial.

It is well settled that the "ex post facto [clause] does not give a criminal a right to be tried, in all respects, by the law in force when the crime charged was committed." Dobbert v. Florida, 432 U.S. 282, 293 (1977). Rather, a change in the law that is "procedural ... is not ex post facto." Id. "Statutes which simply enlarge the class of persons who may be competent to testify in criminal cases are not ex post facto in their application to prosecutions for crimes committed prior to their passage." Hopt v. Territory of Utah, 110 U.S. 574, 589-590 (1884).

The Tenth Circuit has held that victim impact evidence "does not violate the ex post facto prohibition . . . because it neither changes the quantum of proof nor otherwise subverts the presumption of innocence." Neill v. Gibson, 278 F.3d 1044,

1053 (10th Cir. 2001). Similarly, the Fourth Circuit has concluded that admission of victim impact evidence in a sentencing conducted prior to <u>Payne</u> was not prejudicial because the rule in <u>Payne</u> would properly apply at any resentencing. <u>Washington v. Murray</u>, 952 F.2d 1472, 1480 (1991). We agree with our sister circuits and conclude that the Arkansas victim impact evidence statute is procedural in nature and does not offend the ex post facto clause.[8] Arkansas's statute does not alter the potential penalty faced by any defendant, nor does it alter the state's burden of proof. <u>Cf.</u> <u>Payne</u>, 501 U.S. at 825 ("Victim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question, evidence of a general type long considered by sentencing authorities."). Accordingly, the state court's determination that the Arkansas statute does not violate the ex post facto clause was not contrary to Supreme Court precedent.

## B.

Nooner argues that without guidance to the jury on how to consider victim impact evidence, the Arkansas statute is void for vagueness, violates the Eighth Amendment, and otherwise offends due process. We evaluate vagueness challenges to statutes not involving First Amendment rights based on the particular facts of the case. <u>U.S. v. Maull</u>, 806 F.2d 1340, 1344 (8th Cir. 1986).

The Constitution does not require that a state ascribe specific weight to aggravating or mitigating factors in a capital sentencing proceeding. <u>Harris v.</u>

---

[8]In <u>State v. Metz</u>, 162 Or.App. 448 (Or. Ct. App. 1999), <u>petition for review denied</u>, 330 Or. 331 (Or. 2000), the question was whether a change in the state's victim impact evidence statute was "a general change in evidentiary law that affects the way something is proved, but that does not affect the nature of what is proved ...." <u>Id.</u> at 457. The court held that because the statutory change made victim impact evidence relevant where it previously had not been, the revision "changed the fundamental nature of the question the jury was to answer" and therefore violated the ex post facto provision of the Oregon Constitution. <u>Id.</u> at 460. We decline to extend this reasoning to our interpretation of the United States Constitution.

Alabama, 513 U.S. 504, 512 (1995). "There is nothing unfair about allowing the jury to bear in mind the harm [caused by the crime] at the same time as it considers the mitigating evidence introduced by the defendant." Payne, 501 U.S. at 826. Here, the evidence admitted against Nooner is the same kind of evidence admitted in Payne: a family member of the victim explaining to the jury the impact the murder has had on the victim's family. Nooner has failed to show how this testimony differs from that in Payne or how it unduly prejudices him. He fares no better in his due process and Eighth Amendment arguments, and we thus conclude that the state court's rejection of these arguments comports with Supreme Court precedent.

C.

Finally, Nooner argues that his two trial counsel were ineffective in failing to develop and present mitigation evidence at sentencing. Nooner contends that his counsel: (1) never sought to have a psychiatric expert appointed; (2) never obtained school or hospital records; and (3) never interviewed Nooner's family members, social workers, or foster parents. The district court, presented with the same three alleged deficiencies, held that Nooner had procedurally defaulted on all claims that counsel "failed to gather, develop, and present mitigation evidence" except for the claim related to "the psychiatric evidence."[9] We agree with the district court, and thus we address only Nooner's allegation that counsel failed to pursue psychiatric testimony or a mental examination.

The Arkansas Supreme Court correctly identified Strickland v. Washington, 466 U.S. 668 (1984), as the controlling authority for ineffective assistance of counsel claims. Strickland requires that an ineffective assistance of counsel claim establish

---

[9]The district court's analysis on the merits made clear that "psychiatric evidence" referred to trial counsel's decision not to pursue or offer psychiatric testimony.

both deficient performance and prejudice to require reversal of a death sentence. Id. at 687.

1.

Our first inquiry is whether the Arkansas Supreme Court unreasonably applied Strickland in concluding that trial counsel were not ineffective. When strategic choices are made "after less than complete investigation [they] are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Id. at 690-91. A particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments. Id. at 691. Accordingly, our review under 28 U.S.C. § 2254 of a state court's application of Strickland is twice deferential: we apply a highly deferential review to the state court decision; the state court, in turn, is highly deferential to the judgments of trial counsel.

The Arkansas trial court held a multi-day hearing on Nooner's ineffective assistance of counsel claims (the "Rule 37 hearing"), the transcript of which spans 269 pages. When asked whether she had presented mitigating circumstances to the jury, Lea Ellen Fowler, one of Nooner's trial counsel, responded:

> [T]hat was something that we looked long and hard to find things and . . . as the Court is aware, there are some statutory criteria and Mr. Nooner did not meet any of those criteria. He was not from a broken home. Even though the . . . man that raised him was not his biological father, that was the man that had raised him from, I believe, the time that he was two (2) years old. And . . . his parents had done all they could to provide for him. He didn't suffer from alcoholism[10] or drug abuse, or you know, any of those standard mitigating circumstances. The fact that

---

[10]Although the record reflects that Nooner had a problem with alcohol abuse during his teenage years, this fact was presented to the jury during the penalty phase through testimony from Nooner's stepfather.

he spent time in Rivendell; I believe that we went into that. I believe that his parents testified about the troubles that he had had in school and . . . any possible circumstance that could be raised.

Rule 37 Hearing Transcript at 13-14 (Testimony of Lea Ellen Fowler). Nooner cross-examined Ms. Fowler,[11] asking her whether the records from Rivendell were "disclosed in the closing arguments for mitigating circumstances." Id. at 25:19-21. She responded:

> There was not anything in this to be mitigating towards you, Mr. Nooner. <u>This was detrimental to you</u>. The . . . doctors at Rivendell concluded that you were the cause of all of your problems and it was your unwillingness to adapt your behavior to societal norms that was causing you these problems. I . . . don't think that that was of any benefit to you and . . . we discussed whether or not to bring somebody from Rivendell and it was the opinion of all of us that that would be detrimental to you.

Id. at 25:22-26:5 (emphasis added).

The conclusions of the doctors at Rivendell are summarized in a five-page document (the "Report") that was generated when Nooner was discharged from the facility in 1986. A copy of the Report was introduced during the Rule 37 hearing and was included as part of the record in Nooner's appeal to the Arkansas Supreme Court. The Report uses mostly non-clinical terms to describe relatively straightforward observations. It states that Nooner was "referred [to Rivendell] for increasing oppositional behavior, running away from home, and violent outbursts." According to the Report, Nooner's parents had informed the staff at Rivendell that Nooner had

---

[11]After testimony from Nooner's witnesses, Nooner fired his appointed counsel and was permitted to proceed *pro se* for the duration of the hearing. We agree with the district court's determination that the record was fully developed on the relevant claims at the time that Nooner undertook his self-representation.

been in "numerous fights" and Nooner's parents "felt that he was rude, disruptive, disobedient, and disrespectful."

At the time of his admission to Rivendell, Nooner's mood "was one of mild depression, indignation, anger, and resentment." Emotionally, he appeared to be "very narcissistic, egocentric, and self-centered with very little feeling or regard for the welfare of others." Nooner told the staff at Rivendell that he "usually resort[ed] to aggression and anger to get his way when things [didn't] work out."

Although the Report suggested that Nooner had "considerable family dysfunction, as evidenced by multiple family conflicts" and that he was "somewhat depressed," there is no indication that he had any mental or psychological problems. The Report also made clear that Nooner "did not take any psychotropic medication."

The Rivendell Report, like the testimony at the Rule 37 hearing, supports trial counsels' judgment not to pursue psychiatric testing for purposes of mitigation. The Arkansas Supreme Court's conclusion that these judgments did not render counsel ineffective was not an unreasonable application of Strickland.

2.

Even if we were to determine that the Arkansas Supreme Court unreasonably applied Strickland in concluding that Nooner's trial counsel were not ineffective, we could not grant the habeas petition unless we determined that Nooner's constitutional rights were violated. 28 U.S.C. § 2254(a). To reach this conclusion, we would have to determine that Nooner has satisfied the prejudice prong of Strickland. See Wiggins v. Smith, 539 U.S. 510, 525 (2003) ("In order for counsel's inadequate performance to constitute a Sixth Amendment violation, petitioner must show that counsel's failures prejudiced his defense."). Because the Arkansas Supreme Court never reached the prejudice issue, we review that issue *de novo*. See id. at 534 (". . . our

-12-

review is not circumscribed by a state court conclusion with respect to prejudice, as neither of the state courts below reached this prong of the <u>Strickland</u> analysis").

Nooner asserted to the Arkansas Supreme Court that his trial counsels' failure to secure psychiatric testing and testimony meant that his "difficult childhood and his psychiatric and mental problems" were not presented to the jury. He fails to establish prejudice with regard to either aspect of this contention.

As to Nooner's "difficult childhood," the record reflects that Nooner's mother was acquitted of a single charge that she had physically abused Nooner, that Nooner had been placed in several foster homes, that Nooner had behavioral problems, that Nooner had a tenth grade education, and that Nooner had developed a problem with alcohol abuse in his teenage years. Nooner's stepfather testified as to all of this information during the penalty phase. Nooner has offered no evidence about his childhood that was not presented to the jury but that would have been uncovered through psychological testing. Cf. <u>Williams</u>, 529 U.S. at 395-96 (counsel failed to present evidence to jury that Williams's parents had been imprisoned for the criminal neglect of Williams and his siblings; that Williams had been severely and repeatedly beaten by his father; that Williams had been placed in an abusive foster home; and that Williams was "borderline mentally retarded"); <u>Wiggins</u>, 539 U.S. at 516-17 (counsel failed to present evidence to the jury that Wiggins's alcoholic mother frequently left him and his siblings alone for days, forcing them to beg for food and to eat paint chips and garbage; that Wiggins's mother had sex with men while her children slept in the same bed and that she had once forced Wiggins's hand against a hot stove, causing him to be hospitalized; that Wiggins was physically abused by two foster mothers, raped by a foster father, and gang-raped by boys in another foster home; and that Wiggins was sexually abused by a supervisor in his Job Corps program).

It is similarly difficult to ascertain what "psychiatric and mental problems" were not presented to the jury. The jury heard testimony from Nooner's stepfather that Nooner spent several months at Rivendell. The Rivendell Report indicates that Nooner was not diagnosed with any psychiatric disorder and that he never received psychotropic medication during his stay. The Rule 37 transcript contains several oblique references to a stay in a second hospital, Bridgeway, but Nooner has offered no details about this second hospitalization and there is no indication that it was the result of psychiatric or mental problems. As to Nooner's behavioral and emotional problems, the Rivendell Report indicated that Nooner was narcissistic, egocentric, self-centered, and "somewhat depressed." During his stay at Rivendell, Nooner showed a "dramatic" response to treatment and a "marked" ability to overcome his behavioral problems. There is simply no evidence in the Rivendell Report or elsewhere to support Nooner's bare allegations that he suffered from psychiatric and mental problems.

We conclude that the state court's disposition of Nooner's ineffectiveness claim was not an unreasonable application of Strickland.

The judgment dismissing the petition for habeas corpus on its merits is affirmed.

LAY, Circuit Judge concurring in part and dissenting in part.

I concur with Part II of Judge Wollman's opinion finding that Terrick Nooner's request to withdraw his habeas petition is not knowing and voluntary. I further concur that Arkansas's victim impact is constitutional. However, I respectfully dissent from Part III-C of the majority's opinion regarding Nooner's ineffective assistance of counsel claim.

As part of their preparation for the trial, Nooner's two appointed counsel learned that Nooner experienced a turbulent and troubled childhood which included child abuse, foster home placements, severe emotional and behavioral problems, school problems, substance abuse, and two hospitalizations at psychiatric institutions during Nooner's early teenage years. Based on their observations of Nooner's behavior, Nooner's attorneys determined that he was competent to stand trial and did not request a competency evaluation. Likewise, relying upon their own observations of Nooner's current behavior and their reading of a six-year old discharge report from one of the psychiatric institutions, Nooner's attorneys did not request assistance of a psychiatric expert to examine Nooner for the purpose of preparing mitigating evidence during the penalty phase of the trial.

In the state court, the victim's mother testified during the penalty phase of the trial and described the impact the murder had on her family. Nooner's stepfather also gave testimony about Nooner's troubled childhood, and to a lesser extent, about Nooner's emotional problems. Nooner's trial counsel attempted to persuade the jury that severe stress and his young age of twenty-two mitigated the crime. The jury heard no psychiatric evidence.

Nooner presented twelve independent claims of ineffective assistance of counsel at his post-conviction proceeding in state district court. Among other things, Nooner claimed ineffective assistance because his attorneys failed to request a psychiatric evaluation to assess his competency to stand trial (the so-called "Act III" evaluation). Nooner also included a similar but independent claim of ineffective assistance based on his attorneys' failure to request a psychological examination for the purpose of developing and presenting mitigating evidence during the penalty phase of his trial (the so-called "mitigation evaluation").

In Nooner's appeal to the Arkansas Supreme Court, Nooner abandoned his claim of ineffective assistance of counsel based on failure to request the Act III

evaluation, but pursued his claim of ineffective assistance of counsel based on a failure to request a mitigation evaluation. Then in his federal habeas petition, Nooner asserted five independent claims of ineffective assistance of counsel including failure to secure a mitigation evaluation. The district court held that, except for the failure to secure a mitigation evaluation, Nooner had procedurally defaulted on all of his ineffective assistance of counsel claims. Nooner now appeals only that portion of his ineffective assistance claim related to the mitigation evaluation. I agree with the district court that Nooner procedurally defaulted on all of his ineffective assistance claims except for the one based on mitigation evaluation.[12]

"An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). To establish deficient performance, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). In order to establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Id.* at 694.

---

[12]The defaulted claim of ineffective assistance based on the attorneys' failure to fully investigate Nooner's troubled childhood may share a factual background with the claim of ineffective counsel based on a failure to secure a psychiatric expert to present mitigating evidence at the penalty phase. For instance, at a new sentencing hearing, a psychiatric expert might delve into Nooner's troubled childhood and testify about those experiences in an attempt to mitigate the sentence. Such testimony would be wholly appropriate. A psychiatric expert should not be prevented from testifying about Nooner's troubled childhood and dysfunctional social behavior if the psychiatric expert determined they were relevant for the purpose of presenting mitigating psychiatric evidence. This is a death penalty case and Nooner is entitled to every benefit of a reasonable doubt.

***Deficient Performance.***

In evaluating whether counsels' performance fell below an objective standard of reasonableness, it is necessary to first identify the relevant professional standard of care. While *Strickland* counsels that no particular set of rules can satisfactorily govern the myriad of unique circumstances facing defense counsel, "[p]revailing norms of practice as reflected in the American Bar Association standards and the like . . . are guides to determining what is reasonable . . . ." *Id.* at 688. The Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (February 1989) ("Guidelines") state that "[c]ounsel should conduct independent investigations relating to the guilt/innocence phase and to the penalty phase of a capital trial. Both investigations should begin immediately . . . and should be pursued expeditiously." Guideline 11.4.1 at A. The Guidelines further explain that when selecting witnesses or evidence to present at sentencing,

> counsel should consider the following: 1) Witnesses familiar with and evidence relating to the client's life and development, from birth to the time of sentencing, who would be favorable to the client, explicative of the offense(s) for which the client is being sentenced, or would contravene evidence presented by the prosecutor; 2) *Expert witnesses to provide medical, psychological, sociological or other explanations for the offense(s) for which the client is being sentenced . . . .*

Guideline 11.8.3 at F. (emphasis added).

Attorneys representing clients who face the death penalty are specifically advised to consider all reasonably available evidence, including expert testimony.

> Counsel should present to the sentencing entity or entities all reasonably available evidence in mitigation unless there are strong strategic reasons to forego some portion of such evidence. Among the topics counsel should consider presenting are: 1) Medical history (including mental

-17-

and physical illness or injury, alcohol and drug use, birth trauma and developmental delays); 2) Educational history (including achievement, performance and behavior), special educational needs (including cognitive limitations and learning disabilities) and opportunity or lack thereof; . . . 5) Family, and social history (including physical, sexual or emotional abuse, neighborhood surroundings and peer influence); and other cultural or religion [sic] influence, professional intervention (by medical personnel, social workers . . .) or lack thereof; prior correctional experience (including conduct on supervision and in institutions, education or training, and clinical services); . . . 8) *Expert testimony concerning any of the above and the resulting impact on the client*, relating to the offense and to the client's potential at the time of sentencing.

Guideline 11.8.6 at A. and B. (emphasis added). With the appropriate professional standards of care established, I turn to the performance of Nooner's two attorneys at trial.

In preparation for trial, defense counsel engaged an investigator who interviewed Nooner's mother about his history. These conversations revealed that, during Nooner's early teenage years, he was placed in foster care after his mother was charged with child abuse and placed in two separate psychiatric institutions for severe emotional and behavioral problems. This preliminary investigation also revealed that Nooner experienced substance abuse problems. Trial counsel obtained records from Rivendell which indicated that Nooner was under socialized, and experienced "considerable family dysfunction, as evidenced by multiple family conflicts." Abstract of Exhibits to Rule 37 Hearing at 248 (Nooner's brief to the Arkansas Supreme Court) (the "Rivendell Report"). The Rivendell Report further identified that his reading skills were four years behind placement, his math and written skills were five years behind placement, his knowledge was three years behind placement, and even though he was fourteen years old, his education level was that of a third grader. Id. at 249. This report concluded that Nooner's behavioral problems were not

caused by psychosis. Trial counsel terminated their investigation without obtaining school records, medical records, or records from child protection services. Trial counsel did not contact Nooner's treating psychiatrists or request any type of sociological or psychiatric expert to assist them in developing or presenting a mitigation case.

Considering that Nooner faced the death penalty, developing this line of mitigating evidence was his best, and perhaps only, possibility of avoiding death. While the decision not to challenge Nooner's competency to stand trial appears sound, I take issue with his attorneys' decision not to secure a psychiatric expert to evaluate Nooner for purposes of developing mitigating evidence. The Guidelines advise defense counsel to "present to the sentencing entity or entities all reasonably available evidence in mitigation unless there are strong strategic reasons to forego some portion of such evidence." Guideline 11.8.6 at A. The Guidelines further advise trial counsel to consider "[e]xpert testimony concerning any of [mitigating evidence] and the resulting impact on the client, relating to the offense and to the client's potential at the time of sentencing." *Id.*

One of Nooner's attorneys testified at the Rule 37 post-conviction hearing that the introduction of the Rivendell Report would not help Nooner's case and that its contents foreclosed the need for further psychiatric investigation. Testimony of Ms. Lea Ellen Fowler, Rule 37 Hearing Transcript at 25-26. Trial counsels' characterization at the Rule 37 hearing of their potential mitigation case suggests they discounted too quickly potential mitigating evidence. In contrast to Ms. Fowler's testimony at the Rule 37 hearing, the record shows that Nooner was indeed from a broken home: by the age of fourteen, he had been removed from his home by the state, had been transferred from foster home to foster home, and subsequently institutionalized for several months at Rivendell. Additionally, in contrast to Ms. Fowler's testimony, the record shows that Nooner did indeed suffer from substance abuse.

The information available to Nooner's trial counsel indicated significant childhood disturbances that merited further investigation. While the Rivendell Report may have reasonably foreclosed psychosis itself as a mitigating circumstance, it did not foreclose an investigation into reasons for Nooner's multiple foster home placements, investigation into his low educational achievements, or an investigation into his substance abuse. Most importantly, it did not foreclose the potential value of engaging a psychiatric expert to evaluate Nooner and to explain to the jury the resulting impact these experiences had on Nooner. *See* Guideline 11.8.6 at B(8).

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* Nooner's trial counsels' "strategic" decision not to pursue expert psychiatric assistance for the penalty phase was simply premature based on the initial information available to counsel. Under the facts of this case, I conclude that this failure to request a psychiatric expert to examine Nooner for the purpose of developing and presenting mitigating evidence constituted ineffective assistance of counsel under the Sixth Amendment.[13]

### Prejudice.

In addition to deficient performance, Nooner must also establish prejudice to obtain relief. "In assessing prejudice, we reweigh the evidence in aggravation against

---

[13]I do not suggest that trial counsel had a duty to present such testimony if, after adequate investigation, it appeared that it would be harmful to Nooner's mitigation case. I simply conclude that failure to pursue such evidence, based on the information available to them at the time, was unreasonable under the circumstances. *Wiggins v. Smith*, 539 U.S. 510, 523-24 (2003); *Pickens v. Lockhart*, 714 F.2d 1455, 1466-67 (8th Cir. 1983).

the totality of available mitigating evidence." *Wiggins, 539 U.S. at 534.* Because Arkansas required juror unanimity to impose the death sentence, trial counsel only had to persuade one juror that there was a reasonable doubt whether the aggravating factors outweighed the mitigating factors, persuade a single juror that Nooner deserved mercy, or persuade a single juror to spare his life. *See* ARK. CODE ANN. § 5-4-603 (1987).

Although Nooner's stepfather testified during the penalty phase about Nooner's troubled childhood and, to a limited extent, about his behavioral and emotional problems, without the testimony from a psychiatric expert, "the jurors were left with no guidance concerning how they might take such facts into consideration in mitigation of punishment." *Stephens v. Kemp*, 846 F.2d 642, 655 (11th Cir. 1988). The fact that no one other than Nooner's obviously biased stepfather presented this mitigating evidence "diminished the impact on the jury of the facts [he] described."[14] *Id.* at 654. A psychiatric expert could have provided invaluable corroborating evidence strengthening the stepfather's emotional testimony. I conclude that, given the scope and nature of Nooner's troubled childhood, a psychiatric expert could have developed and presented potentially powerful mitigating evidence.

As the record stands, we lack enough information to determine whether the psychiatric evidence would have changed the verdict of death. No lower court has conducted any meaningful assessment of this evidence. I would therefore remand this

---

[14]During the guilt phase, Nooner's stepfather (Mr. Hendricks) testified as Nooner's alibi witness that Nooner was home at the time of the murder. Considering the jury convicted Nooner, they obviously found Mr. Hendricks' testimony less than credible. Nonetheless, Nooner's attorneys put the same discredited witness on the stand as the sole witness presenting mitigating evidence. Nooner's mother was unable to testify at trial. Apparently, her doctor considered the emotional stress too great and advised her not to testify.

case to the district court for a plenary hearing to evaluate Nooner's expert psychiatric evidence to make this determination of prejudice in the first instance.

While Nooner may have been prejudiced by ineffective assistance of counsel during the penalty phase of his trial, prior to issuing relief it is also necessary to find that the adjudication of Nooner's claim by the Arkansas Supreme Court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States . . . ." 28 U.S.C. § 2254(d)(1). "[A] state-court decision involves an unreasonable application of [Supreme Court] precedent if the state court identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 407 (2000).

The Arkansas Supreme Court resolved Nooner's claim as follows:

> Nooner alleges ineffective assistance of counsel because defense counsel did not request a mental evaluation as allowed under Ark.Code Ann. § 5-2-309. Nooner contends the results could have produced evidence that may have gone toward establishing some mitigating circumstance in sentencing. He argues that his counsel's failure to request an evaluation prevented the judge and jury from having critical evidence showing a limited capacity. *Competency to stand trial has not been raised as an issue.* Nooner's counsel did not request a mental evaluation. At the hearing below, Nooner's trial counsel testified that they saw no reason for an evaluation at the time of trial. They reported that Nooner involved himself intimately in his defense. He did legal research, participated in strategy discussions, and was articulate and able to convey his concerns and wishes. They also reported that Nooner behaved significantly different in the Rule 37 hearing than he did during

-22-

his trial. Nooner offered testimony from his mother[15] that he had behavioral problems and emotional problems which they had shared with his trial counsel. However, she acknowledged that although he had been treated at Rivendale [sic], he had not been treated at a psychiatric facility nor prescribed anti-psychotic medication.

Our review of the record indicates that the trial court thoroughly evaluated Nooner's claim and reasonably believed the testimony of trial counsel that *they carefully considered whether to request an evaluation but discerned no good-faith basis for doing so.* Nooner's trial counsel also presented evidence that they had adduced evidence of Nooner's troubled past and treatment through his stepfather during the penalty phase of his trial. We hold Nooner has not established that trial counsel's decision not to request a psychiatric evaluation constituted ineffective assistance.

*Nooner v. State*, 4 S.W.3d 497, 500 (Ark. 1999) (emphasis added). Although the Arkansas Supreme Court identified the correct Supreme Court precedent under *Strickland*, it performed an unreasonable application of the governing legal rules to the facts of the case.

First, the Arkansas Supreme Court incorrectly characterized Nooner's claim as one of competency to stand trial, when in fact Nooner's claim was about failure to investigate and present mitigating evidence. On appeal to that court, Nooner was not attempting to resurrect the competency issue, he was claiming "ineffective assistance of counsel as a result of the failure to seek psychiatric testimony for the penalty phase and to present the evidence thereon." Abstract and Brief for Appellant at 356 (Nooner's appellate brief before the Arkansas Supreme Court). However, when reviewing Nooner's ineffective assistance claim, the Arkansas Supreme Court interjected issues only relevant to the competency issue which was not appealed. For

---

[15]This testimony occurred after the trial in the Rule 37 post-conviction proceeding in the state district court.

example, the Arkansas Supreme Court's opinion, *supra*, states that Nooner's claim is based on a failure to "request a mental evaluation as allowed under Ark. Code Ann. § 5-2-309." *Nooner*, 4 S.W.3d at 500. However, this cited statute is specific to "Determination of fitness to proceed." *See* Ark. Code Ann. § 5-2-309 (1987). Furthermore, the Arkansas Supreme Court's discussion of Nooner's behavior at his trial and at the post-conviction hearing in state court (as a valid reason for not requesting an evaluation) demonstrates that the issue of competency to stand trial was conflated with the issue of a mitigation evaluation.

Second, the Arkansas Supreme Court's conflation of the distinct claims of competency to stand trial with mitigation at sentencing caused that court to apply the wrong standard of care in evaluating defense counsels' professional conduct. The Arkansas Supreme Court identified the statutory authority which governs competency to stand trial, *see* ARK. CODE ANN. § 5-2-309 (1987), and then applied the corresponding "good faith" basis professional standard from the ABA Criminal Justice Mental Health Standards[16] to evaluate trial counsels' performance. However, the good faith standard from the ABA Criminal Justice Mental Health Standards does not apply to conduct during the penalty phase of capital cases. The standard that should have been applied appears in The Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (February 1989). No United States Supreme Court case holds, or even suggests, that a good faith basis to question the

---

[16]The relevant guideline states:

> In the absence of *good faith* doubt that the defendant is competent to stand trial it is improper for either party to move for evaluation. It is improper for either party to use the incompetence process for purposes unrelated to incompetence to stand trial such as to obtain information for mitigation of sentence, to obtain favorable plea negotiation, or to delay the proceedings against the defendant.

ABA Criminal Justice Mental Health Standard 7-4.2(e) (1989) (emphasis added).

defendant's competency to stand trial is required prior to investigating or presenting psychologically-based mitigating evidence.

The application of the wrong standard meant that the Arkansas Supreme Court failed to evaluate Nooner's trial counsels' performance for reasonableness under prevailing professional norms of practice. *Strickland*, 466 U.S. at 688. This was an objectively unreasonable application of clearly established Supreme Court precedent. 28 U.S.C. § 2254(d).

I would hold that Nooner's allegation of ineffective assistance of counsel is sufficient to require a federal district court to evaluate the expert psychiatric evidence and determine whether a new trial before a jury on the penalty phase of Nooner's trial should be held.

BYE, Circuit Judge, dissenting in part and concurring in part.

Both my colleagues conclude Terrick Nooner was incompetent to request the dismissal of his habeas petition. Because the record shows Nooner understood the significance of his decision and its consequences, I respectfully disagree and would honor Mr. Nooner's request to dismiss his petition.

I

We apply a clearly erroneous standard to the district court's determination Nooner was competent to dismiss his federal habeas petition, Smith v. Armontrout, 812 F.2d 1050, 1058 (8th Cir. 1987), and thus I begin with a discussion of the record the district court considered. Pursuant to an order of an administrative panel of this court, the district court had Nooner undergo a mental competency evaluation at the United States Medical Center for Federal Prisoners in Springfield, Missouri. Dr. Richart DeMier evaluated Nooner, and subsequently filed a report opining Nooner

lacked the competency to dismiss his petition. Dr. DeMier concluded Nooner was feigning mental illness, but nevertheless believed Nooner was incompetent based on two factors.

First, Dr. DeMier based his opinion regarding Nooner's incompetency on Nooner's disorganized pattern of speaking when discussing his legal case. In Dr. DeMier's opinion, this exhibited a disordered thought process in which Nooner's ideas and statement were not linked together in a rational way.

Second, Dr. DeMier did not believe Nooner could articulate a rational reason for wanting his habeas petition dismissed. Nooner indicated, however, the dismissal of his habeas petition will trigger an execution date, which in turn will trigger an opportunity to appear before an executive clemency board. Dr. DeMier reports Nooner "explained that, by Arkansas law, once an execution date is set, he has the opportunity to appear before an 'executive clemency board.'" Nooner further explained he will then have a hearing and an opportunity to call witnesses – an opportunity he feels has been denied him in his habeas proceedings. Specifically, Dr. DeMier's report indicates Nooner said "[a]ll I need is an opportunity for a hearing and to call witnesses."

Nooner believes the murder charge against him in the state proceeding underlying this habeas petition is unlawful because, although he was initially arrested for possessing stolen property, he was never charged with and proven guilty of that crime. Specifically, Dr. DeMier's report indicates Nooner said "[t]hey never arrested me for the charge I'm doing." Nooner believes Arkansas's failure to charge him with the crime for which he was arrested invalidates the arrest as well as the subsequent murder charge – because the murder charge followed from the initial arrest. Dr. DeMier indicated Nooner "focus[ed] on allegations that he was not detained, arrested, charged, tried or convicted in the proper manner," and said "[t]he source of where these murder charges came from were never proven . . .. It's a poisonous fruit tree."

-26-

Nooner wants the opportunity to present these arguments to the executive clemency board.

Nooner confused Dr. DeMier, however, by describing his theories about the unlawful arrest as a "removed lawsuit" (that is, the possession of stolen property charge) being "concealed" by the courts, because the courts never charged Nooner with that crime. Dr. DeMier misunderstood Nooner to believe this "hidden" or "removed" lawsuit would be revealed by a judge or judges at the executive clemency hearing. Dr. DeMier candidly admitted "I was never able to understand his rationale for this reported belief." On the basis of his inability to understand Nooner's theory, Dr. DeMier concluded Nooner was delusional and engaged in "magical thinking," because everyone knows judges do not conceal or reveal hidden lawsuits.

After Dr. DeMier provided his report, the state deposed Dr. DeMier and sought their own experts to address Nooner's competency. Before the competency hearing was held, two doctors from the Arkansas State Hospital provided reports opining Nooner was competent to dismiss his habeas petition. Dr. Charles Mallory, the forensic staff psychologist at the state hospital, concluded Nooner was a competent malingerer. He disputed both points upon which Dr. DeMier based his finding of incompetence.

First, with respect to the disorganized pattern of speaking Nooner exhibited when discussing his case, Dr. Mallory believed there was a method to Nooner's madness. Dr. Mallory cited several examples where Nooner would start with a logical response to a question, then add a delusional ideation or irrational statement. For example, when Dr. Mallory asked Nooner what happened during his evaluation at the Springfield Medical Center, Nooner replied: "Dr. DeMier, he said I was delusional, seeing things that aren't true. I don't know if he found me incompetent." That was a logical and rational response to the question posed by Dr. Mallory. But Nooner then added a delusional ideation to his statement: "I got air bubbles in my

body." Dr. Mallory cited another specific example. When asked if he had any mental problems, Nooner said: "No. The only problem I have is being toyed with when I know my rights." Again, a logical and rational response to the question. Nooner then added: "I'm suffering from anguish because I have glands on my penis." Again, a delusion ideation or irrational ending. Dr. Mallory cited other examples of this pattern as well. In Dr. Mallory's opinion, this pattern of starting with a logical response, but ending with an irrational statement, coupled with the fact Nooner's statements were always grammatically comprehensible, was simply further evidence Nooner was feigning mental illness.

Second, with respect to Dr. DeMier's belief Nooner could not articulate a rational reason for wanting his habeas petition dismissed, Dr. Mallory opined Nooner correctly understood the consequences and significance of his decision. Nooner understood an execution date would be set if his habeas petition were dismissed, which would in turn trigger a hearing before the clemency board. Dr. Mallory expressed his understanding of Nooner's theories regarding the "hidden" or "removed" lawsuit much differently than Dr. DeMier had. Dr. Mallory understood Nooner believed his arrest on the murder charge was illegal because he was never prosecuted for the charge for which he was initially arrested, theft of a motor vehicle, i.e., the "hidden" lawsuit. Nooner planned to reveal this "hidden" lawsuit at the clemency hearing by calling witnesses, including the judge who presided over the underlying state charges. Dr. Mallory explained Nooner's argument showed an unsophisticated understanding of the legal process, but a rational desire to present his theories to a clemency board because Nooner believed he had "messed up" his habeas petition.

The state respondents also obtained the opinion of Dr. Oliver Hall, the medical director of forensic services at the Arkansas State Hospital. Dr. Hall essentially agreed with Dr. Mallory's opinions in all respects.

-28-

When the district court held the competency hearing, all three doctors testified and were subject to cross-examination. Dr. Mallory thoroughly discussed and explained Nooner's supposedly delusional ideas about the "hidden" or "removed" lawsuit. Specifically, Dr. Mallory testified:

> [Nooner] showed that he wants to present this information in some kind of forum, maybe the clemency board or review board. He has an idea, among others, that because he and another man were caught in a stolen car – that's when he was arrested – that he wasn't charged with car theft or anything else, he was just charged with murder – first of all, he thinks there's something wrong with the justice system and he should have been charged with murder – I mean, of car theft or something else first, and since he wasn't, they've concealed this lawsuit.

App. at 439. Dr. Mallory further opined that Nooner's desire to present this information to an executive clemency board showed an "inadequate comprehension of certain legal procedures or processes," id. at 437-38, and "lack[ed] legal sophistication," id. at 439, but was logical and understandable. Id.

II

Based on the record presented to the district court, I find nothing clearly erroneous about the district court's conclusion Nooner was competent to request the dismissal of his habeas petition. The record shows Nooner made a knowing and voluntary decision. In reviewing the testimony and reports of the three experts who testified regarding Nooner's competency, I believe the record shows Nooner articulated a rational reason for wanting to dismiss the petition. Nooner understands an execution date will not be set until his habeas proceedings are complete. He understands a hearing before the executive clemency board will not be set until an execution date is set. Nooner first moved this court to dismiss his habeas petition on April 30, 2003, the day after the appeal was docketed. His desire to have the petition dismissed – so he could have a clemency hearing sooner rather than later – is

understandable. Witnesses get older and memories fade, evidence is lost or becomes stale. Nooner can not pursue his theory about his unlawful arrest in this habeas proceeding (the claim was never raised in state court and would be procedurally barred), believes that to be his best argument, and wants the chance to present the argument before an executive clemency board. Now, two years later, Nooner still has not had that chance.

It may be misguided, perhaps even desperate, for Nooner to believe he has a better chance of exoneration before the clemency board than he has in this habeas proceeding, but I see nothing delusional about that belief. As Dr. Mallory indicated in the district court proceedings, Nooner's misconception of the strength of his legal position does not equate with incompetence – otherwise we would have to conclude many habeas petitioners who appear before us are incompetent. Nor does Dr. DeMier's inability to understand Nooner's inartful references to a "hidden" or "removed" lawsuit mean Nooner was delusional. I suggest that merely means the good doctor failed to understand Nooner's "jailhouse" theory.

The paternalistic temptation to believe we know better than Nooner what is in his best interests is strong, particularly because this is a death penalty case. I find it necessary to set aside that temptation, however, in order to honor Nooner's right to control the course of this litigation as he sees fit. In the absence of clear record evidence Nooner failed to understand the significance and consequences of his decision, I would respect Nooner's right of self-determination and grant his request to dismiss this petition.

III

Although I would grant Nooner's request to dismiss this habeas petition, I must decide the merits of one of the claims raised in the petition on which my colleagues disagree because we could not issue a mandate otherwise. My colleagues disagree

on whether Nooner's trial counsel was ineffective in failing to present psychiatric mitigation evidence during the penalty phase of Nooner's trial. After carefully considering the arguments presented by both my colleagues, I conclude Nooner failed to establish the Arkansas Supreme Court's resolution of his ineffective assistance of counsel claim was contrary to or an unreasonable application of clearly established Federal law, as determined by the Supreme Court. I therefore concur in denying the habeas petition.

_____